IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 39921-4-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DUSTIN W. KIERNAN, | ) | |
| | ) | |
| Appellant. | ) | |

MURPHY, J. — A jury convicted Dustin W. Kiernan of two counts of first degree child molestation and two counts of first degree rape of a child.

Kiernan appeals and makes the following assignments of error: (1) the trial court admitted unreliable child hearsay statements, (2) the trial court gave an incorrect unanimity instruction that violated double jeopardy, (3) the prosecutor committed misconduct during closing argument, (4) the trial court forced a verdict by instructing the jury to reach a verdict, (5) the trial court failed to vacate one child molestation count as it merged with the rape of child count, and (6) the trial court imposed unlawful community custody conditions.

The State agrees that one of the two counts of child molestation should have been merged at sentencing with one of the counts of child rape, and remand is necessary to vacate that child molestation conviction. The State also concedes that it would be appropriate for the trial court to address several of Kiernan's community custody concerns on remand.

We agree that one count of child molestation should have merged with one count of child rape, and remand for the trial court to vacate that child molestation conviction. On remand, the trial court should also address several of Kiernan's community custody concerns. We otherwise affirm.

## BACKGROUND

F.K.[1] was born in March 2011. When she was around five years old, F.K. began living with her father in Alaska. F.K.'s father was a single parent and worked full time. He frequently relied on Dustin Kiernan and Kailye Saggs, a couple, for childcare. The father and Kiernan were friends, with the father considering Kiernan to be like a brother.

---

[1] To protect the privacy interests of the minor child, we use her first and last name initials throughout the body of this opinion. Gen. Order 2012-1 of Division III, *In re Use of Initials or Pseudonyms for Child Victims or Child Witnesses* (Wash. Ct. App. June 18, 2012), https://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber=2012_001&div=III.

In 2018, F.K. moved with her father to an apartment complex in Liberty Lake. In the summer of 2019, Kiernan and Saggs moved from Alaska to Liberty Lake into the same apartment complex as F.K. and her father Kiernan and Saggs resumed providing childcare, regularly watching F.K. In February of 2020, Kiernan and Saggs moved into a home in North Spokane.

Around the end of May or early June 2020, F.K. and her father moved into an apartment complex in Airway Heights.

In June 2020, when F.K. was nine years old, her father received a phone call from Kiernan, who said he wanted to take F.K. to the park. When the father called F.K. to let her know that Kiernan was picking her up to take her to the park, F.K. "started to break down and get really upset" and "started to apologize and tell [her father] she was sorry." 2 Rep. of Proc. (RP) (Jan. 17, 2023) at 923. While still on the phone, F.K. disclosed that Kiernan touched her and did things she did not like. Following this disclosure, the father went to his apartment to speak to F.K. She told her father that she had experienced "discomfort and a pain in her lower area at the time that her and [Kiernan] were in a room together." 2 RP (Jan. 17, 2023) at 943. She also expressed that Kiernan "put something into her mouth and that she didn't know what it was." 2 RP (Jan. 17, 2023) at 943-44. F.K. further disclosed that the touching began before she turned eight years old. At some point either before or after the father spoke in person with F.K., he contacted law

3

enforcement to make a report. An investigation revealed that the most recent incident between F.K. and Kiernan took place within two weeks of F.K.'s disclosure to her father.

As part of the investigation, a forensic interview of F.K. was conducted. In this interview, F.K. revealed three distinct incidents in which Kiernan engaged in inappropriate contact with her. F.K. described playing in the sprinklers at Kiernan's home in North Spokane. At trial, this was referred to as the "sprinkler incident." 3 RP (Jan. 19, 2023) at 1427. While F.K. was playing in the sprinklers, Saggs left to go to the store to get groceries. F.K. proceeded into the residence where Kiernan had F.K. change her shirt. Kiernan then "pushed [her] on the bed" and "started touching [her] privates." Ex. P1 at 28 min., 11 sec. to 28 min., 37 sec. F.K. told the interviewer that Kiernan "took two fingers" and "rubbed down there," both gesturing to and describing the area as her "crotch." Ex. P1 at 41 min., 47 sec. to 42 min., 51 sec. F.K. described that the crotch is the area that helps her "go pee" and what Kiernan did there felt "weird." Ex. P1 at 42 min., 52 sec. to 42 min., 59 sec.; 46 min., 52 sec. She knew it was two fingers that touched her because she could feel the "two bumps." Ex. P1 at 42 min., 15 sec. to 42 min., 35 sec. F.K. physically demonstrated and described the positions she was in during the incident, which included being in a fetal position with Kiernan holding her legs, and also "kind of like crawling" on her hands and knees. Ex. P1 at 30 min., 0 sec. to 30 min., 5 sec.; 44 min., 35 sec. to 45 min., 11 sec.; 45 min., 28 sec. to 45 min., 42 sec.; 46 min.,

0 sec. to 46 min., 6 sec. During this incident, Kiernan placed his hand over F.K.'s mouth. She was "scared" and told Kiernan, "please just stop, I don't like it." Ex. P1 at 30 min., 10 sec. to 30 min., 24 sec. She could not see what was happening, but she heard what sounded like someone "clapping their hands." Ex. P1 at 41 min., 59 sec. to 42 min., 4 sec.; 48 min., 41 sec. to 49 min., 18 sec. After the incident, Kiernan told F.K. that "if you tell your dad you are going to get hurt a lot and your dad's gonna get hurt too." Ex. P1 at 30 min., 34 sec. to 30 min., 41 sec. F.K. was nine years old at the time of this incident.

The second incident F.K. described occurred earlier in time at Kiernan's apartment. At trial, this was referred to as the "couch incident." 3 RP (Jan. 17, 2023) at 1041. F.K. was in the living room on the couch when Kiernan had her bend over and take off her pants. Ex. P1 at 57 min., 20 sec. to 57 min, 46 sec.; 1 hr., 3 min, 45 sec. to 1 hr., 45 min., 55 sec. She did not remember seeing anything but recalled hearing a "clapping noise." Ex. P1 at 57 min., 30 sec., to 57 min., 45 sec.; 59 min., 51 sec. to 59 min., 55 sec. F.K. said she was on her hands and knees and that her eyes were closed because she did not want to look. She described the event as a "bumping," like she was on a bus that was "gravelly on the bottom." Ex. P1 at 57 min., 45 sec. to 58 min., 5 sec. She said the "bumping" made her crotch uncomfortable. Ex. P1 at 58 min., 15 sec. to 58 min., 45 sec. While the incident was happening, Kiernan held his hand over her mouth, and it felt like

5

she was "drowning," and she could not breathe. Ex. P1 at 59 min., 20 sec. to 59 min., 56 sec. Kiernan made threats warning F.K. not to tell anyone about the incident. Ex. P1 at 1 hr., 0 min., 40 sec. to 1 hr., 1 min., 14 sec. F.K. was eight years old when this incident occurred.

The third described incident, referred to at trial as the "bookshelf incident," 3 RP (Jan. 23, 2023) at 1696-97, occurred at F.K.'s apartment in Liberty Lake in her bedroom. Ex. P1 at 1 hr., 6 min., 25 sec. to 1 hr., 6 min., 47 sec. F.K. was in her room alone with Kiernan, who directed F.K. to open her mouth. She had her eyes shut. She felt something go inside her mouth. F.K. described the object in her mouth tasted like how armpits smell. She said it felt like veins in her mouth. F.K. was eight years old at the time of this incident.

Based on these three incidents, Kiernan was arrested and charged with two counts of first degree child rape and two counts of first degree child molestation.

A child hearsay hearing preceded trial. A jury found Kiernan guilty on all counts. He was subsequently sentenced to 189 months to life in prison.

ANALYSIS

Kiernan makes six assignments of error : (1) the trial court admitted unreliable child hearsay statements, (2) the trial court gave an incorrect unanimity instruction that violated double jeopardy, (3) the prosecutor committed misconduct during closing

arguments, (4) the trial court forced a verdict by instructing the jury to reach a verdict, (5) the trial court failed to vacate one child molestation count as it merged with a rape of a child count, and (6) the trial court imposed unlawful community custody conditions.

*Admission of child hearsay statements*

Prior to trial, the trial court determined the reliability of F.K.'s out-of-court statements through a child hearsay hearing. F.K.'s father, F.K., a pediatric nurse who performed a physical examination of F.K., and a forensic interviewer testified at this hearing. The trial court concluded that the time, content, and circumstances of the statements provided sufficient indicia of reliability when applying the *Ryan*[2] factors and subsequent case law, and that F.K.'s statements would be admissible at trial. The trial court's oral ruling was incorporated into its written findings of fact and conclusions of law, of which there were 44 findings and 37 conclusions.

On appeal, Kiernan has not assigned error to any specific finding of fact or conclusion of law made by the trial court. "Unchallenged findings of fact are treated as verities on appeal." *State v. Valdez*, 167 Wn.2d 761, 767, 224 P.3d 751 (2009); s*ee also* RAP 10.3(a)(4), (g).

---

[2] *State v. Ryan*, 103 Wn.2d 165, 691 P.2d 197 (1984).

Kiernan argues that the trial court abused its discretion when it ruled F.K.'s child hearsay statements were admissible. Kiernan argues that when evaluated as a whole, the *Ryan* factors do not support the trial court's admission of F.K.'s hearsay statements. The State responds that the evidence weighs in favor of reliability, and the trial court did not abuse its discretion. We agree with the State.

"Appellate courts will carefully review the evidence and testimony presented in evaluating the exclusion and admission of child hearsay statements even under the abuse of discretion standard." *State v. Swan*, 114 Wn.2d 613, 667, 790 P.2d 610 (1990). "Appellate courts also recognize, however, that the trial court is in the best position to make the decisions as to competency and credibility." *Id.* "The abuse of discretion standard, as applied in child hearsay cases, does not ignore the constitutional issues at stake, but acknowledges the obvious, that the trial court is the only court that sees the children and listens to them and to the other witnesses in such a case." *Id.*

Under an abuse of discretion standard, the reviewing court will find error only when the trial court's decision "(1) adopts a view that no reasonable person would take and is thus 'manifestly unreasonable,' (2) rests on facts unsupported in the record and is thus based on 'untenable grounds,' or (3) was reached by applying the wrong legal standard and is thus made 'for untenable reasons.'" *State v. Sisouvanh*, 175 Wn.2d 607,

623, 290 P.3d 942 (2012) (quoting *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993)).

We review a trial court's findings of fact for substantial evidence. *See State v. Veltri*, 136 Wn. App. 818, 821, 150 P.3d 1178 (2007). "Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). "Unchallenged findings of fact are verities on appeal." *Veltri*, 136 Wn. App. at 821.

On the general admissibility of a child's statement in the context of sex offenses, RCW 9A.44.120 provides in relevant part:

> (1) A statement not otherwise admissible by statute or court rule, is admissible in evidence in dependency proceedings under Title 13 RCW and criminal proceedings, including juvenile offense adjudications, in the courts of the state of Washington if:
> (a)(i) It is made by a child when under the age of ten describing any act of sexual contact performed with or on the child by another, describing any attempted act of sexual contact with or on the child by another, or describing any act of physical abuse of the child by another that results in substantial bodily harm as defined by RCW 9A.04.110 . . . .
> . . . .
> (b) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability; and
> (c) The child . . . :
> (i) Testifies at the proceedings . . . .

Reliability is analyzed according to the nine *Ryan* factors:

> (1) whether the child had an apparent motive to lie, (2) the child's general character, (3) whether more than one person heard the statements, (4) the spontaneity of the statements, (5) whether trustworthiness was suggested by the timing of the statement and the relationship between the child and the witness, (6) whether the statements contained express assertions of past fact, (7) whether the child's lack of knowledge could be established through cross-examination, (8) the remoteness of the possibility of the child's recollection being faulty, and (9) whether the surrounding circumstances suggested the child misrepresented the defendant's involvement.

*State v. Woods*, 154 Wn.2d 613, 623, 114 P.3d 1174 (2005) (plurality opinion) (citing

*Ryan*, 103 Wn.2d at 175-76). "Not every factor need be satisfied; it is enough that the

factors are 'substantially met.'" *Id.* at 623-24 (quoting *Swan*, 114 Wn.2d at 652).

Ryan *factor analysis*

*1. Whether the child had an apparent motive to lie*

Kiernan argues that F.K. had a motive to lie. He claims that she may not have

wanted to go to the park that day because she may have wanted to stay at home and

watch TikTok or she may not have wanted to be subject to discipline imposed by Kiernan

or Saggs. The trial court acknowledged, in light of going into a more structured family

unit that had rules, F.K. possibly could have been motivated to lie, but the trial court did

not find this to be an apparent motive to lie. Instead, the trial court found the probability

of an apparent lie to be "extremely remote given the totality of the circumstances." 1 RP

(Jan. 11, 2023) at 426. The trial court's unchallenged findings of fact 13 and 17 describe

a good relationship between F.K., Kiernan, and Saggs, with F.K. holding both adults in high regard and enjoying spending time with them despite there being more rules.

The trial court did not abuse its discretion in weighing factor one in favor of admissibility. *See Swan*, 114 Wn.2d at 648 (indicating a good relationship with alleged perpetrator supports lack of motive). There is no evidence in the record that F.K. did not want to go to the park on the day of the disclosure because there was something else she wanted to do at home. Neither the record nor the findings support Kiernan's claim, framed as a possibility, as a motive to lie.

### 2. The child's general character

Kiernan argues that F.K.'s father was the only witness to testify about F.K.'s character, and that both F.K. and her father admitted that F.K. had previously lied. With regard to this factor, the trial court stated that F.K.'s character was typical for that of a child of her age when testifying. Further, it was demonstrated through the forensic interview and F.K.'s testimony at the hearing that she knew the importance of telling the truth and understood the difference between the truth and a lie. Moreover, F.K. was resistant to accepting things stated to her that, from her perspective, were not completely truthful. F.K. had a reputation for truthfulness as testified to by her father. Although F.K.'s father was the only person to testify to F.K.'s character, the trial court

was in the best position to make decisions on competency and credibility. The trial court did not abuse its discretion in weighing factor two in favor of admissibility.

### 3. *Whether more than one person heard the statements*

Kiernan acknowledges that more than one person heard F.K.'s disclosures of abuse, but avers that "[a]lthough only [F.K.]'s father heard her initial declaration, she repeated the statements to other people after speaking with him." Appellant's Opening Br. at 33. Since Kiernan provides no analysis beyond this statement, there is nothing more for this court to review.

### 4. *The spontaneity of the statements*

Kiernan offers a brief argument on the issue of spontaneity of F.K.'s statements. "[F.K.] made the accusations in response to being told she was going to spend the day at the park with Mr. Kiernan and his family. Her father initiated the conversation." Appellant's Opening Br. at 33-34 (citation omitted). Washington law recognizes that "a child's answers are spontaneous so long as the questions are not leading or suggestive." *State v. Young*, 62 Wn. App. 895, 802 P.2d 829, 817 P.2d 412 (1991). Here, F.K. made spontaneous statements to her father about abuse. Her father did not initiate a conversation with F.K. on the issue of whether she had sexual contact with Kiernan. Rather, F.K. offered the information spontaneously after her father told her that Kiernan was going to pick her up to take her to the park. In addition, F.K.'s medical examination

was performed by an examiner who was careful not to make any suggestions to F.K,

and with the examination being performed outside the presence of her father. During this

medical examination, F.K. described sexual contact between herself and Kiernan.

Finally, during the forensic interview, F.K. described in both words and by physical

demonstration conduct of a sexual nature between her and Kiernan. This factor weighs in

favor of reliability and admissibility.

> *5. Whether trustworthiness was suggested by the timing of the statement and the relationship between the child and the witness*

Regarding timing and relationship between the child and witness to the statements,

Kiernan argues that the timing suggests the disclosure was made for the purpose of F.K.

being able to stay home. Kiernan claims the subject of sexual abuse surfaced only after

F.K. was told she was going to do something that she did not want to do. Kieran offers

no evidence and no legal authority to support this claim.

"We recognize that a lapse of time and intervening counseling could affect

the reliability of a child's statements regarding abuse. The underlying issue in any

RCW 9A.44.120 determination [on admissibility] is whether the time, content, and

circumstances of the statement provide sufficient indicia of reliability." *State v. Carlson*,

61 Wn. App. 865, 872, 812 P.2d 536 (1991). "'[I]t is *possible* that [i]f there is evidence

of prior interrogation, prompting, or manipulation by adults, spontaneity may be an

13

inaccurate indicator of trustworthiness.'" *Id.* (alterations in original) (internal quotation

mark omitted) (quoting *Idaho v. Wright,* 497 U.S. 805, 826-27, 110 S. Ct. 3139, 111 L.

Ed. 2d 638 (1990)). The "trial judge may find child hearsay statements unreliable on the

ground that there has been a lapse of time and intervening counseling between the abuse

and the statements at issue only when the evidence demonstrates that the lapse or

counseling somehow affected the child's statements." *Id.* at 872-73.

　　With respect to the relationship between the child and the witness who heard the

statement, "[w]hen the witness is in a position of trust with a child, this factor is likely to

enhance the reliability of the child's statement." *State v. Kennealy*, 151 Wn. App. 861,

884, 214 P.3d 200 (2009). Where a child makes statements to trained professionals, such

as law enforcement officers or medical professionals, the court has found that a child may

trust those individuals "because of their authoritative position in the community and

because the discussion took place in a trusting or clinical atmosphere." *Id*.

　　Here, there is no evidence that the lapse in time affected F.K.'s statements to

her father, a medical professional in a trusted environment, and a forensic interviewer in

a controlled atmosphere. For these reasons, factor five weighs in the favor of reliability

and admissibility.

14

### 6. Whether the statements contained express assertions of past fact

Regarding whether the statements contained express assertions of past facts, Kiernan provides a two-sentence analysis with no citation to legal authority. Kiernan states, "In this case the statements are about past facts. The last alleged incident took place eleven days prior to [F.K.]'s statements to her father." Appellant's Opening Br. at 34. Kiernan's passing treatment of this factor is insufficient to merit judicial review. *See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

### 7. Whether the child's lack of knowledge could be established through cross-examination

This factor relates to whether the child's lack of knowledge could be established through cross-examination. Kiernan acknowledges that "[F.K.] testified and was subject to cross[-]examination." Appellant's Opening Br. at 34-35. With this concession, this court accepts that Kiernan does not challenge F.K.'s statements as admissible based on this factor.

### 8. The remoteness of the possibility of the child's recollection being faulty

Kiernan argues there are instances of F.K.'s memory being faulty, claiming she testified penetration took place anally, which was inconsistent with her forensic interview

15

in which F.K. alleged vaginal penetration and described issues with urination. Kiernan argues this inconsistency suggests F.K. has a faulty memory.

The focus of factor eight is whether the child's recollections are faulty or if the child had a normal memory and ability to perceive. *See Woods*, 154 Wn.2d at 624. Here, F.K. was nine years of age when she disclosed abuse that happened when she was both nine and eight years old. She was 11 years old when testifying at the child hearsay hearing. With the passage of years between the abuse, the child hearsay statements, and F.K.'s courtroom testimony, her statements offer consistent information as to where the incidents occurred, how the incidents occurred, and descriptions of the rooms in which the incidents occurred. During the forensic interview, F.K. did not disclose anal penetration, and described the area of her body that hurt was her "crotch." Ex. P1 at 58 min., 15 sec. to 58 min., 45 sec. At the time of her testimony in court, F.K.'s ability to articulate body penetration likely matured. Regardless, the trial court made the determination that F.K.'s statements of past facts and claims of sexual contact by Kiernan were "absolutely consistent." Clerk's Papers (CP) at 359. With the consistency of F.K.'s disclosures largely matching her court testimony, factor eight weighs in favor of reliability and admissibility.

> ### *9. Whether the surrounding circumstances suggested the child misrepresented the defendant's involvement*

The last *Ryan* factor is whether the surrounding circumstances suggest F.K. misrepresented Kiernan's involvement. Kiernan argues that the timing of the declaration suggests her motive to lie and further argues F.K. had trouble following rules and had a desire to stay on TikTok. Kiernan argues that evaluated together, the factors do not support the trial court's admission of the F.K.'s hearsay statements.

Here, as pointed out by the State, Kiernan's arguments relate to a concern regarding F.K.'s potential motive to lie. As this was addressed in our analysis of factor one, we will not engage in further review of Kiernan's challenge.

The *Ryan* factors weigh in favor of reliability and admissibility. The trial court here was able to see F.K. and listen to her, along with other witnesses who testified. The trial court was in the best position to make decisions on competency and credibility. It did not adopt a view that no reasonable person could make or make a decision based on untenable grounds. There was no abuse of discretion in finding F.K.'s hearsay statements admissible for trial.

No. 39921-4-III
*State v. Kiernan*

*Unanimity jury instruction*

During the jury instruction conference, the State proposed use of a modified version of WPIC 4.25,[3] adding three words to the standard WPIC language. Kiernan did not object to the use of WPIC 4.25 but did suggest changes to the language within the instruction identifying the crimes charged, stating a desire to eliminate confusion regarding the number of charges brought by the State. The trial court adopted the State's proposal and instructed the jurors as follows on unanimity:

> The State alleges that the defendant committed acts of child molestation in the first degree and rape of a child in the first degree on multiple occasions. To convict the defendant on any count of child molestation in the first degree or rape of a child in the first degree, one particular act of child molestation in the first degree or rape of a child in the first degree must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved *for that count*. You need not unanimously agree that the defendant committed all the acts of the child molestation in the first degree or rape of a child in the first degree.

CP at 339 (emphasis added). The emphasized language above was the addition requested by the State to the pattern instruction.

For the first time on appeal, Kiernan argues the trial court erred by giving WPIC 4.25, known as the *Petrich*[4] instruction, because WPIC 4.26 was the proper instruction to give. On appeal, Kiernan contends WPIC 4.25 does not require the jury

---

[3] 11 WASHINGTON PRACTICE: PATTERN JURY INSTRUCTIONS: CRIMINAL 4.25, at 124 (5th ed. 2021) (WPIC).

18

to unanimously agree that a separate and distinct act, as to each count, has been proven beyond a reasonable doubt. Kiernan argues this instructional error violated his constitutional right to jury unanimity and protections against double jeopardy because the prosecution elected specific acts in closing statements, and the instruction's use of the singular "act" rather than "acts" allowed the jury to convict him on multiple counts based on the same act.

The State argues that the unanimity instruction as given adequately protected Kiernan's rights, and any claimed error is not manifest under RAP 2.5(a)(3).

*Standard of review*

Kiernan did not object at trial to the instruction based on WPIC 4.25. He also did not propose the use of WPIC 4.26. Generally, we do not review unpreserved errors. RAP 2.5(a). However, an appellant may raise a manifest error affecting a constitutional right for the first time on appeal. RAP 2.5(a)(3); *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). To qualify, the error must be (1) truly constitutional and (2) manifest, meaning it had practical and identifiable consequences at trial that should have been obvious to the court. *State v. Kirkman*, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007); *O'Hara*, 167 Wn.2d at 99. "'In the normal usage, "manifest" means unmistakable, evident or indisputable, as distinct from obscure, hidden or concealed.'" *State v. Weaver*,

---

[4] *State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984).

198 Wn.2d 459, 466, 496 P.3d 1183 (2021) (quoting *State v. Ackerman*, 11 Wn. App. 2d 304, 312-13, 453 P.3d 749 (2019)).

Instructional errors implicating jury unanimity or double jeopardy are constitutional in nature. *Petrich*, 101 Wn.2d at 572 (unanimity); *State v. Mutch*, 171 Wn.2d 646, 661, 254 P.3d 803 (2011) (double jeopardy). We first determine whether there was error. If there was, then we assess if it was a manifest constitutional error. *O'Hara*, 167 Wn.2d at 99. In his arguments on appeal, Kiernan conflates unanimity and double jeopardy. We address each in turn.

*Unanimity*

Kiernan argues that because the prosecutor elected specific acts during closing argument, the trial court should have given WPIC 4.26 (no unanimity instruction needed for continuing course or elected acts) instead of WPIC 4.25 (the *Petrich* instruction). He claims WPIC 4.25 was unnecessary under *State v. Carson*, 184 Wn.2d 207, 357 P.3d 1064 (2015), where a *Petrich* instruction is required only when the State fails to elect. Kiernan argues that giving the instruction violated his right to a unanimous verdict by not informing the jury of the applicable law. Kiernan further contends the use of the singular "act" in WPIC 4.25, combined with the prosecutor's argument in closing, that the same acts could support both count two (first degree rape of a child) and count three (first degree child molestation) allowed nonunanimous verdicts.

"Criminal defendants in Washington have a right to a unanimous jury verdict." *State v. Ortega-Martinez*, 124 Wn.2d 702, 707, 881 P.2d 231 (1994) (citing WASH. CONST. art. 1, § 21). "This right includes the right to an expressly unanimous *verdict*." *Id*. "When the prosecution presents evidence of multiple acts of like misconduct, any one of which could form the basis of a count charged, either the State must elect which of such acts is relied upon for a conviction or the court must instruct the jury to agree on a specific criminal act." *State v. Coleman*, 159 Wn.2d 509, 511, 150 P.3d 1126 (2007). "By requiring a unanimous verdict on one criminal act, we protect a criminal defendant's right to a unanimous verdict based on an act proved beyond a reasonable doubt." *Id*. at 511-12.

In multiple-acts cases, the State must elect the act relied on for each count, or the court must give a *Petrich* instruction requiring unanimity on a specific act. *Petrich*, 101 Wn.2d at 572; *Carson*, 184 Wn.2d at 217. If the prosecutor elects in closing, then a *Petrich* instruction is not required. *Carson*, 184 Wn.2d at 228. However, giving a *Petrich* instruction when an election is made is not error—it provides *extra* protection by ensuring unanimity on the elected act. *See Coleman*, 159 Wn.2d at 512 (instructions ensuring unanimity on specific acts support valid verdicts). The modified language Kiernan requested did not alter this; it merely clarified phrasing without proposing WPIC 4.26.

Here, the unanimity instruction given by the court states that, to convict Kiernan on any count, the jurors must unanimously agree that a specific criminal act had been proved beyond a reasonable doubt. Therefore, the instruction ensured that a conviction on any given count would be predicated on the jury's unanimous agreement regarding the commission of a specific criminal act. *See State v. Borsheim*, 140 Wn. App. 357, 364, 366, 165 P.3d 417 (2007) (Finding that the following jury instruction language provided unanimity protection: "*To convict the Defendant, one or more particular acts must be proved beyond a reasonable doubt and you must unanimously agree as to which act or acts have been proved beyond a reasonable doubt.* You need not unanimously agree that all the acts have been proved beyond a reasonable doubt.") Kiernan's right to jury unanimity was not violated. Any claimed error was not manifest under RAP 2.5(a)(3). *See Kirkman*, 159 Wn.2d at 935.

### *Double jeopardy*

Citing to *Borsheim*, 140 Wn. App. 357 (convictions vacated where instructions permitted same-act use for multiple counts), Kiernan argues the instructions allowed multiple punishments for the same offense, and thus violated his constitutional right to be free from multiple punishments. He claims the singular "act" rather than "acts" allowed the jury to convict him of multiple counts for one act.

22

Double jeopardy prohibits multiple punishments for the same offense. U.S. CONST. amend. V; WASH. CONST. art. I, § 9; *Mutch*, 171 Wn.2d at 661. In multiple-acts child sex cases, inadequate instructions can violate double jeopardy if they fail to ensure distinct acts support each count. *See Mutch*, 171 Wn.2d at 663; *see also State v. Peña Fuentes*, 179 Wn.2d 808, 825-26, 318 P.3d 257 (2014).

Our review of a double jeopardy claim is de novo. *Mutch*, 171 Wn.2d at 661-62. It is a rigorous review and we look at the full record before the trial court, including the evidence, argument, and instructions to the jury. *Id*. at 664. We consider factors such as separate "to convict" instructions, directives to treat counts as distinct crimes, alignment of counts with described acts, and prosecutorial emphasis on separate incidents. *Id*. Courts often give "separate and distinct" instructions to protect against double jeopardy. *Mutch*, 171 Wn.2d at 663; *State v. Land*, 172 Wn. App. 593, 600, 295 P.3d 782 (2013) (holding double jeopardy arises at sentencing if verdicts are factually identical).

Here, no double jeopardy violation occurred from the instructions, that included separate "to convict" instructions, a directive to decide each count independently, and an instruction based on WPIC 4.25 that requires a "particular act" for each count. These are in addition to arguments during closing in which the State elected distinct acts and matched those to the four counts. This made it manifestly apparent that separate acts were

23

required. *Mutch*, 171 Wn.2d at 665. The singular "act" was not problematic given the context. Rather, it emphasized specificity per count. Kiernan has shown no prejudice, as the election and evidence supported distinct acts. *See Coleman*, 159 Wn.2d at 512.

Any claimed error is not manifest under RAP 2.5(a)(3), lacking identifiable consequences obvious on the record. *O'Hara*, 167 Wn.2d at 99-100; *Kirkman*, 159 Wn.2d at 935.

*Suggestions for jury deliberation procedures (WPIC 4.73)*

During the jury instruction conference, the trial court stated an intent to use a tailored version of WPIC 4.73 to provide suggestions to the jury for deliberations, and that this would be an oral statement given separately from the reading of the final jury instructions, given after closing argument but before deliberations commenced. Neither party objected.

On appeal, Kiernan claims the trial court forced a verdict by instructing the jury it was required to reach a verdict with it not being contemplated that the jury may not be able to reach a verdict because it was deadlocked. Kiernan argues this pressured the jury into unanimity, infringing upon his right to a jury trial under the Sixth Amendment to the United States Constitution and article I, section 21, of the Washington State Constitution.

Kiernan claims, pursuant to CrR 6.15(f)(2), that a trial court is forbidden from suggesting the need for agreement of jurors. Kiernan challenges the trial court's

statement: "Finally, I remind you that these remarks are merely suggestions. I hope they're helpful to you. Nothing I've said or done should suggest to you what your verdict should be. This is entirely for you to decide." 4 RP (Jan. 23, 2023) at 1734. The trial court further clarified that the suggestive instruction was "actually not an instruction but some suggestions for your deliberations . . . ." 4 RP (Jan. 23, 2023) at 1732.

The State points out that deliberations had not yet begun when the trial court gave its suggestions for deliberation procedures. Rather, in conformance with the notes on use and comments for WPIC 4.73, the trial court orally gave its suggestions immediately after closing argument but before deliberations commenced. We agree with the State and hold no error occurred, let alone a constitutional error.

To prevail on a claim of improper judicial interference with a verdict, a defendant "must establish a reasonably substantial possibility that the verdict was improperly influenced by the trial court's intervention." *State v. Watkins*, 99 Wn.2d 166, 178, 660 P.2d 1117 (1983). "*After jury deliberations have begun*, the court shall not instruct the jury in such a way as to suggest the need for agreement, the consequences of no agreement, or the length of time a jury will be required to deliberate." CrR 6.15(f)(2) (emphasis added). "The purpose of this rule is to prevent judicial interference in the deliberation process." *State v. Boogaard*, 90 Wn.2d 733, 736, 585 P.2d 789 (1978). Further, "the jury should not be pressured by the judge into making a decision." *Id.*

Kiernan did not object in the trial court. We review unpreserved claims only if they present a manifest error affecting a constitutional right. RAP 2.5(a)(3); *O'Hara*, 167 Wn.2d at 98. Mere speculation about jury coercion is insufficient. *State v. Ford*, 171 Wn.2d 185, 189, 250 P.3d 97 (2011) (plurality opinion).

This claim fails at every step. First, the remarks by the trial court were proper and noncoercive. WPIC 4.73 and its note on use expressly authorize the exact language used here. It is appropriate for trial judges to remind juries that the verdict is theirs alone and that nothing the judge has said or done should be taken as indicating what the verdict should be. *See* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.73, note on use at 167 (5th ed. 2021). Kiernan cites no authority that holds predeliberation remarks must affirmatively inform jurors of the possibility that they may deadlock. CrR 6.15(f)(2) governs supplemental instructions given during deliberations to avoid coercing holdouts. That rule is inapplicable here as the jury had not yet begun deliberating.

The trial court's oral suggestions were proper, noncoercive, and authorized by WPIC 4.73. Kiernan fails to show manifest constitutional error under RAP 2.5(a)(3).

*Prosecutorial misconduct*

Relevant to this appeal, defense counsel made the following remarks in closing argument:

I submit to you that every sexual description given by [F.K.] could be found by a simple search on the Internet. A picture of a penis with a vein can be found by typing in "penis." A picture of people having doggy-style sex and videos of it can be simply found by typing in "doggy-style sex." Lastly, *pictures of white stuff coming out of a man's penis can also be found and viewed.* Again, without Internet controls, each of these photos and videos could be viewed time and time again by a child or an adult for that matter.

4 RP (Jan. 23, 2023) at 1710 (emphasis added).

In rebuttal closing argument, the prosecutor made the following statements:

You are the sole judges of the credibility and you don't have to check your common sense at the door. You know how your memory works. You know that your own memories are stronger the closer in time to when the event happened. You know that. You also know, based on [defense expert's] testimony, he never interviewed [F.K.], he never talked to her, he never did anything specifically with this case. And when I clarified that he was in no way offering an opinion about [F.K.'s] credibility or reliability of her testimony, he had to emphatically agree, he cannot do that. He told you that.

. . . .

I also want to point out that when I asked him about the studies that he is using to form his opinions, we—we hammered down on one specific study. And it's important, because *that study has been basically debunked* but he is still using it even in 2021. On the stand, in testimony, in criminal trials, he's using it to support his opinion.

. . . .

. . . [F.K.] then asked [the forensic child interviewer] if she could ask her a question. She then said, "*There was white stuff. Do you know what that is?*" Nobody had ever introduced white stuff. Nobody had talked about it in this forensic interview. She told [the forensic child interviewer] that it was on the floor after it happened and on the couch whenever it happened. She said it was on the floor every time Dustin [Kiernan] abused her at the house. She then described that he would get a paper towel to wipe it up.

27

> [*Defense counsel*] *has no explanation for that because there is none other than Mr. Kiernan sexually abused this child until ejaculation.*
> Now, based on [F.K.'s] descriptions, that could only have come from the experience of these things happening to her rather than speculation about what she might have seen on a screen or speculation about what somebody may have suggested to her.

4 RP (Jan. 23, 2023) at 1719-21, 1729-30 (emphasis added).

On appeal, Kiernan argues that the prosecutor committed misconduct during closing argument. First, over defense counsel's objection, Kiernan claims the prosecutor mischaracterized the testimony of an expert for the defense when the prosecutor said a study relied on by that expert had "been basically debunked," 4 RP (Jan. 23, 2023) at 1720-21, when no witness had used that phrase. Second, and for the first time on appeal, Kiernan claims the prosecutor committed misconduct when defense counsel was referred to by name and the prosecutor told the jury that defense counsel had no explanation for the "white stuff," 4 RP (Jan. 23, 2023) at 1729-30, that F.K. described to an interviewer.

The State argues that the prosecutor argued reasonable inferences from the evidence and properly responded to defense counsel's argument.

"The Sixth Amendment to the United States Constitution guarantees a defendant a fair trial but not a trial free from error." *State v. Fisher*, 165 Wn.2d 727, 746-47, 202 P.3d 937 (2009). A prosecutor's misconduct may deprive a defendant of their right to a fair trial. *State v. Davenport*, 100 Wn.2d 757, 762, 675 P.2d 1213 (1984). The defendant

28

bears the burden of proving the prosecution's conduct was both improper and prejudicial. *Fisher*, 165 Wn.2d at 747. This court reviews the challenged conduct "in the context of the whole argument, the issues of the case, the evidence addressed in argument, and the instructions given to the jury." *State v. Scherf*, 192 Wn.2d 350, 394, 429 P.3d 776 (2018).

If they objected at trial, "the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). However, "failure to object to an improper remark constitutes a waiver of error unless the remark is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994). In other words, "a conviction must be reversed only if there is a substantial likelihood that the alleged prosecutorial misconduct affected the verdict." *Id.* Lastly, in closing argument, "a prosecutor has wide latitude to draw and express reasonable inferences from the evidence." *State v. Mak*, 105 Wn.2d 692, 698, 718 P.2d 407 (1986).

"The hurdles to obtaining relief based on prosecutorial misconduct are purposefully high." *In re Pers. Restraint of Richmond*, 16 Wn. App. 2d 751, 754, 482 P.3d 971 (2021). "Not every prosecutorial misstep merits remand." *Id.* "Deference is instead owed to the trial court's ability to oversee the administration of justice, defense

counsel's judgment about whether an objection was worth raising, and a jury's ability to independently assess the merits of the case." *Id.*

*Characterization of study as "basically debunked"*

Kiernan argues that the prosecutor mischaracterized the testimony of a defense expert by stating a study relied on by that expert had been debunked. This case hinged on credibility and the defense theory was that F.K.'s memories were false or implanted, as supported by expert testimony. Kiernan argues there was no evidence that the study relied on by the expert was debunked, and the statement of the prosecutor likely influenced the jury. The State argues that Kiernan has failed to establish misconduct or prejudice, and the evidence supported the inference made by the prosecution.

During Kiernan's case-in-chief, an expert was called on the topic of memory and false memories. On cross-examination, the expert agreed that he used a "Shaw and Porter study from 2015" to illustrate points while working as an expert over the years. 3 RP (Jan. 19, 2023) at 1494-95. The expert explained that the study pushed the limits by deliberately throwing multiple influences at college-aged students to find out if they can get a vivid, detailed, highly emotional memory for an episode that did not happen. Further, the expert explained that what the Shaw and Porter study was trying to accomplish was "'extreme value sampling.'" 3 RP (Jan. 19, 2023) at 1495. Although he admitted to using the study during his testimony in prior cases, the expert stated that "the

key is to make sure that the study is not over-interpreted, that there's a chance that Shaw

and Porter may have botched their initial data analysis." 3 RP (Jan. 19, 2023) at 1497.

The expert testified that the study could be viewed as "heavy-handed" and ultimately

agreed with the State that it was "problematic." 3 RP (Jan. 19, 2023) at 1497-1500.

During closing, the prosecutor pointed out that the defense expert used the Shaw

and Porter study to form his opinion, even though the study had been "basically

debunked." 4 RP (Jan. 23, 2023) at 1720-21. Defense counsel objected, stating, "I'm

going to object to as only with respect to the false memory as opposed to what one would

expect to see when someone has been undergoing trauma and recalling." 4 RP (Jan. 23,

2023) at 1721. The trial court overruled the objection.

A prosecutor has wide latitude to draw and express reasonable inferences from the

evidence during closing argument. *See Mak*, 105 Wn.2d at 698. The prosecutor argued

the study was "basically debunked" based on testimony elicited on cross-examination of

the defense expert. The prosecutor's use of the word "debunked" was argumentative

hyperbole, not a factual assertion. Saying the study was "debunked" in the context of the

argument and in light of the expert's testimony was a fair inference.

Moreover, Kiernan has not shown prejudice that the prosecutor's statement had a

substantial likelihood of affecting the jury's verdict. The expert himself admitted to

issues within the study. Therefore, it is unlikely that the prosecutor's argument had any substantial impact on the jury.

*"White stuff"*

For the first time on appeal, Kiernan argues, again with little analysis, that the prosecutor committed misconduct by burden shifting when she argued in closing that defense counsel has no explanation for F.K.'s knowledge of the "white stuff." Because there was no objection at trial, Kiernan must meet the heightened burden of demonstrating the prosecutor's argument was so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury. *See Russell*, 125 Wn.2d at 86. Kiernan fails to meet that heightened burden.

Here, the prosecutor did not commit misconduct because she was responding to arguments made by defense counsel. This was permissible reply-in-kind comments. Defense counsel argued during closing that F.K. could have provided sexual descriptions, including pictures of white stuff coming out of a man's penis, based on what people can find and view in a simple internet search. The prosecutor, as an advocate, "is entitled to make a fair response to the arguments of defense counsel." *Russell*, 125 Wn.2d at 87. The prosecutor was rebutting the claim that the "white stuff" came from internet searches, rather than from F.K.'s direct observations of "white stuff" after her encounter

with Kiernan. The response was not misconduct. It was a response to a challenge by

Kiernan to F.K.'s credibility.

*Merger of convictions for counts two and three*

Kiernan argues that the trial court erred by not vacating at sentencing his

conviction for count three (child molestation for the "couch incident" that occurred

between March 5, 2019, and January 31, 2020) as it merged with his conviction for count

two (child rape arising out of the same "couch incident"). He argues count three should

be vacated from his judgment and sentence. The State concedes. We agree and remand

for the trial court to vacate count three from the judgment and sentence.

"'Merger' is a 'doctrine of statutory interpretation used to determine whether the

[l]egislature intended to impose multiple punishments for a single act which violates

several statutory provisions.'" *State v. Berg*, 181 Wn.2d 857, 864, 337 P.3d 310 (2014)

(quoting *State v. Vladovic*, 99 Wn.2d 413, 419 n.2, 662 P.2d 853 (1983)). "The judiciary

has developed the merger doctrine over time as an extension of double jeopardy

principles." *Id.* (citing U.S. CONST. amend. V). "This doctrine 'accepts that there was

sufficient evidence of the elements of the crime but considers further whether the

legislature nevertheless intended for one of the offenses to be extinguished because of its

redundant consideration within the primary offense.'" *State v. Whittaker*, 192 Wn. App.

395, 410, 367 P.3d 1092 (2016) (quoting *Berg*, 181 Wn.2d at 872). "When dealing with

merger issues, we look at how the offenses were charged and proved, and do not look at the crimes in the abstract. We also 'ask[] whether the State was required to prove the act constituting the merging crime to elevate the other crime.'" *Id.* at 411 (alteration in original) (footnote omitted) (quoting *State v. Davis*, 177 Wn. App. 454, 464, 311 P.3d 1278 (2013)).

Here, Kiernan was found guilty of two counts of first degree child rape and two counts of first degree child molestation. We agree with the parties that one of the convictions for child molestation (count three) and one of the convictions for child rape (count two) arose out of the same criminal conduct and should be merged. We therefore remand with instructions to vacate Kiernan's conviction for count three (child molestation) from his judgment and sentence.

*Community custody conditions*

Kiernan challenges the following community custody conditions imposed by the trial court:

> (12) That you complete a mental health evaluation and complete all recommendations for further evaluation, treatment, and/or monitoring to include medication management;
> (13) That you complete a drug/alcohol evaluation and complete all recommendations for further evaluation, treatment, and/or monitoring if recommended by your CCO [community custody officer];
> . . . .

(16) That you do not stay the night or reside on premises where female minors are also staying the night or reside, without prior approval by your SOTP [sex offender treatment program] Therapist and your CCO;

. . . .

(19) That you submit to a sexual history polygraph within 90 days of release from confinement;

. . . .

(22) You must submit to a search of your person, residence, vehicle and/or possessions when requested by a CCO. This includes the search of your computer, cell phone and any other electronic devices;

CP at 197-98.

Kiernan, with minimal analysis, claims the trial court lacked authority to impose these five community custody conditions. He did not object to these conditions at sentencing. Although Kiernan cites to some foundational principles, he does not cite authority relevant to each condition. Passing treatment of an issue is insufficient to merit judicial review. *See Bosley*, 118 Wn.2d at, 809.

As pointed out by the State, a decision by this court to decline to address these conditions would not deprive Kiernan of an opportunity to later seek review. RCW 9.94A.709(2) affords a sex offender released from total confinement an opportunity to move to amend the substantive conditions of community custody. In light of judicial efficiency, and our decision to remand this case to the trial court

to vacate one of Kiernan's child molestation convictions, we address the community custody conditions raised as a concern by Kiernan.[5]

*Standard of review*

"We review community custody conditions for abuse of discretion." *State v. Johnson*, 197 Wn.2d 740, 744, 487 P.3d 893 (2021). "Among other things, '[d]iscretion is abused if it is exercised on untenable grounds or for untenable reasons.'" *Id.* (alteration in original) (quoting *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). Because Kiernan did not object at the trial court level, he must demonstrate (1) error, (2) that is manifest, and (3) implicates a constitutional right. RAP 2.5(a)(3). *O'Hara* 167 Wn.2d at 98. In its discretion, a court may impose as conditions of community custody, "any crime-related prohibitions." RCW 9.94A.703(3)(f).

---

[5] The State also suggests review of community custody condition 17:

> That you do not engage in a romantic or dating or sexual relationship without permission from your SOTP Therapist and your CCO. You must disclose your status as a sex offender and the nature of your offending to include un-adjudicated victims to anyone with whom you intend to begin such a relationship. The disclosure must be verified by your SOTP Therapist and your CCO.

CP at 198. We decline to review this condition as this was not an assignment of error on appeal. As we are remanding for the trial court to reconsider certain other conditions, this issue may be raised on remand.

Whether a condition of sentence is crime-related "is an inherently factual question." *State v. Casimiro*, 8 Wn. App. 2d 245, 249, 438 P.3d 137 (2019). Washington appellate courts also will consider some sentencing errors raised for the first time on appeal, including some claims challenging conditions of community custody in the context of an illegal or erroneous sentence, such as a vagueness challenge, although we need not review a claim if the constitutional error was invited or waived. *State v. Bahl*, 164 Wn.2d 739, 744-45, 193 P.3d 678 (2008) (vagueness); *State v. Studd*, 137 Wn.2d 533, 545-49, 973 P.2d 1049 (1999) (invited error); *State v. Mierz*, 127 Wn.2d 460, 468, 901 P.2d 286 (1995) (waiver of error).

> *Condition 12: complete mental health evaluation and all recommendations for further evaluation, treatment, and/or medication management*

The record on review does not contain evidence of Kiernan having been diagnosed with a mental health condition, that he has exhibited these symptoms, or that any psychological factor contributed to the offenses that resulted in his convictions. The State concedes the absence of such evidence. Imposing an evaluation and possible medication management based solely on the sexual nature of the crime exceeds the court's authority. *See State v. Jones*, 118 Wn. App. 199, 208-09, 76 P.3d 258 (2003). We remand to either strike the condition or make proper findings that a mental health condition influenced Kiernan's offenses.

*Condition 13: complete drug/alcohol evaluation and all
recommendations for further evaluation, treatment, and/or
monitoring if recommended by your CCO*

Kiernan argues that no facts suggest that he had a drug or alcohol problem and that

the court erred by imposing a condition requiring him to complete a drug or alcohol

treatment program or evaluation. Kiernan claims that the condition has no relation to his

convictions. The State responds that although there is evidence that Kiernan may have

substance use issues, no evidence indicates the substance use was related to his offenses

and the trial court made no such findings.

A "crime-related prohibition" is one that "directly relates to the circumstances of

the crime for which the offender has been convicted." RCW 9.94A.030(10). A trial court

abuses its discretion if it imposes a sentencing condition without statutory authority.

*Jones*, 118 Wn. App.at 207-08. There is no evidence in the record that alcohol or drug

use contributed to the charged offenses. Therefore, we remand for the sentencing court

to strike this community custody condition from Kiernan's judgment and sentence.

*Condition 16: Kiernan may not stay the night or reside on premises
where female minors are also staying the night or reside, without
prior approval by his SOTP therapist and his CCO*

Kiernan argues that not being able to stay the night or reside on a premise where

female minors are also staying the night or residing infringes upon his right to parent. The

State defers to this court on whether to order reconsideration of this condition on remand,

38

or whether to require Kiernan to move to modify the condition on release. We agree with Kiernan because there is no evidence the trial court considered his fundamental right to parent his biological children when imposing this condition.

State intervention that restricts the relationship between a parent and their child must be accomplished by procedures meeting the requisites of the due process clause of the Fourteenth Amendment to the United States Constitution. *See Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (plurality opinion). "We generally review sentencing conditions for abuse of discretion. But we more carefully review conditions that interfere with a fundamental constitutional right, . . . such as the fundamental right to the care, custody, and companionship of one's children." *In re Pers. Restraint of Rainey*, 168 Wn.2d 367, 374, 229 P.3d 686 (2010) (citation omitted). "Such conditions must be 'sensitively imposed' so that they are 'reasonably necessary to accomplish the essential needs of the State and public order.'" *Id.* (quoting *State v. Warren*, 165 Wn.2d 17, 32, 195 P.3d 940 (2008)).

In *State v. Martinez Platero*, 17 Wn. App. 2d 716, 487 P.3d 910 (2021), this court remanded for the trial court to reexamine how community custody conditions prohibiting Martinez Platero's contact with all minor children affected his right to parent his own child. Similarly, in *State v. DeLeon*, 11 Wn. App. 2d 837, 456 P.3d 405 (2020), this court remanded for the trial court to conduct a required analysis on the record to address

39

Deleon's constitutional right to parent when it prohibited all contact with his biological children.

Here, Kiernan's community custody condition is less restrictive than the conditions at issue in *Martinez Platero* and *DeLeon* because he has not been ordered to have no-contact with his biological children. Rather, the restriction is related to where female minors are staying the night or where they reside. Although less restrictive, condition 16 here still interferes with Kiernan's fundamental constitutional right to the care, custody, and companionship of his own children. *See Rainey*, 168 Wn.2d at 374. As of 2022, Kiernan's children were young in age, ranging between one and six years of age. Furthermore, it appears that Child Protective Services was involved with his family at one point, but the case has been closed. With this in mind, Kiernan's children may be minors when Kiernan is released from confinement. From our review of the record, it is not clear that there is a danger to his biological children or that the trial court made a proper inquiry on the record into Kiernan's fundamental right to parent. For this reason, we remand for the trial court to conduct an analysis on the record with regard to how this condition impacts Kiernan's fundamental right to parent his biological children.

> *Condition 19: Kiernan must submit to a sexual history polygraph within 90 days of release from confinement*

Kiernan argues that the requirement to submit a sexual history polygraph within 90 days following release from confinement infringes on his right against self-incrimination and violates the Fifth Amendment to the United States Constitution. The State agrees that, as written, this condition potentially could infringe on Kiernan's Fifth Amendment rights. To solve this issue, the State proposes the condition be amended to state: "'That, if requested by your CCO, you submit to a sexual history polygraph within 90 days of release from confinement solely for the purposes of sex offender evaluation and treatment.'" Br. of Resp't at 92.

"'[The] State may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination.'" *State v. King*, 130 Wn.2d 517, 525, 925 P.2d 606 (1996) (quoting *Minnesota v. Murphy*, 465 U.S. 420, 435 n.7, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984)). RCW 9.94A.703(3)(f) authorizes trial courts to order an offender to comply with crime-related prohibitions, including performing acts necessary to monitor an offender's compliance with its orders. RCW 9.94A.030(10). While this authority justifies polygraph testing limited to monitoring the offender's compliance with the community placement

order, it may not be used as a tool to discover evidence of other crimes, past or present.

*State v. Combs*, 102 Wn. App. 949, 952-53, 10 P.3d 1101 (2000).

We remand for the trial court to modify this condition as proposed by the State

and consistent with *Combs*.

> *Condition 22: Kiernan must submit to a search of his person, residence, vehicle and/or possessions (including computer, cell phone and any other electronic devises) when requested by a CCO*

Kiernan offers the conclusory argument that a search of his electronic devices is

not crime-related and that no facts show that such devices played a role in his offense

conduct. He claims the condition implicates his rights under the First Amendment to the

United States Constitution and is not tailored to prevent burdening those rights. The State

disagrees that any crime-relatedness issue exists, but does not object to remand for the

trial court to clarify that any searches must be conducted only to monitor compliance with

the particular probation violation that gave rise to the search and that such searches must

be based on a reasonable suspicion.

"'As a general rule, warrantless searches and seizures are per se unreasonable.'"

*State v. Ladson*, 138 Wn.2d 343, 349, 979 P.2d 833 (1999) (quoting *State v, Hendrickson*,

129 Wn.2d 61, 70, 917 P.2d 563 (1996)). "The 'authority of law' needed is generally a

warrant, 'subject to a few jealously and carefully drawn exceptions.'" *State v. Cornwell*,

190 Wn.2d 296, 301, 412 P.3d 1265 (2018) (quoting *Ladson*, 138 Wn.2d at 349).

However, "individuals on probation are not entitled to the full protection of article I, section 7 [of the Washington State Constitution]." *Id.* at 301 (citing *State v. Olsen*, 189 Wn.2d 118, 124, 399 P.3d 1141 (2017)). "They have reduced expectations of privacy because they are 'serving their time outside the prison walls.'" *Id.* (quoting *Olsen*, 189 Wn.2d at 124-25). "Accordingly, it is constitutionally permissible for a CCO to search an individual based only on a 'well-founded or reasonable suspicion of a probation violation,' rather than a warrant supported by probable cause." *Id.* at 302 (quoting *State v. Winterstein*, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009)).

This exception is codified at RCW 9.94A.631(1) and provides in relevant part, "If there is reasonable cause to believe that an offender has violated a condition or requirement of the sentence, a community corrections officer may require an offender to submit to a search and seizure of the offender's person, residence, automobile, or other personal property." "This threshold requirement protects an individual from random, suspicionless searches." *Cornwell*, 190 Wn.2d at 304. Further, an "individual's privacy interest is diminished only to the extent necessary for the State to monitor compliance with the particular probation condition that gave rise to the search. The individual's other property, which has no nexus to the suspected violation, remains free from search." *Id.*

Here, the trial court did not put a limit on, or purpose for, the searches. We remand for the trial court to clarify that any search must be conducted only to monitor

43

compliance with the particular probation condition that gave rise to the search and that the searches must be based on a reasonable suspicion of probable cause.

## CONCLUSION

We remand for the trial court to vacate Kiernan's conviction for count three (first degree child molestation) and redact all references attributable to it from the judgment and sentence. We also remand for the trial court to reexamine several community custody conditions consistent with the terms of this opinion. We otherwise affirm.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Murphy, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Fearing, J.P.T.[†]

---

[†] George B. Fearing, a retired judge of the Washington State Court of Appeals, is serving as a judge pro tempore of this court pursuant to RCW 2.06.150(1).